Anthony Rock v. Commissioner.
Rock v. Commissioner
Docket No. 86433.
United States Tax Court
T.C. Memo 1962-12; 1962 Tax Ct. Memo LEXIS 294; 21 T.C.M. (CCH) 46; T.C.M. (RIA) 62012; January 25, 1962
*294 Petitioner, owner of a minority stock interest in a dairy, sold his stock, pursuant to a written contract, for $63,000. Petitioner also executed a separate agreement whereby he agreed to refrain from competing with the vendee of his stock for a period of five years. He was to receive $45,000 for this agreement. Held, the agreement not to compete was a separate item of the transaction and the petitioner received ordinary income therefor. Rex E. Sager, Esq., 1704 First National Tower, Akron, Ohio., and Scott A. Belden, Esq., for the petitioner. Thomas J. Moroney, Jr., Esq., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioner's income tax for the years 1955, 1956 and 1957 in the respective amounts of $240.95, $1,353.99 and $1,785.75. The petitioner conceded the correctness of all but one of the Commissioner's adjustments appearing in the statutory notice. The only issue remaining for decision is whether the vendor of a minority stock interest in a dairy company, who also by a separate agreement covenants, inter alia, not to engage in the dairy business for a period of five years, *295 realizes ordinary income or capital gain insofar as that part of the transaction relating to the covenant is concerned. Findings of Fact The petitioner filed his individual income tax returns for each of the years 1955, 1956 and 1957 with the district director of internal revenue at Akron, Ohio. Petitioner first entered into the dairy business in 1919 when he organized his own dairy. In 1930 he sold his company to the National Dairy Company and for the next five years was employed by them. However, in 1935 petitioner left the employ of the National Dairy Company to once again form his own dairy. The petitioner's new corporation was known as the X-Cel Dairy, and petitioner retained control of 85 percent of its stock. Fred Harter had been connected with the dairy business in the Akron, Ohio, area for over 50 years. In 1934 he organized a dairy known as Belle Isle Farm, Inc., hereinafter referred to as Belle Isle, and during the years pertinent hereto served as its president. Because of their long association with the dairy business, both petitioner and Harter were well known in the dairy business, particularly in the Akron area. In 1948 Belle Isle acquired the petitioner's *296 stock in X-Cel Dairy, and the two corporations were merged. The petitioner received 210 shares of Belle Isle stock in exchange for his X-Cel Dairy stock. Following the merger, Belle Isle moved into the premises previously occupied by the X-Cel Dairy. The petitioner was elected secretary of Belle Isle and became a member of its Board of Directors. Harter, who together with his wife owned 495 shares of Belle Isle stock, remained president of the firm. In addition to his duties as secretary of the corporation which involved supervision of the financial affairs of the company, petitioner was responsible for the wholesale phase, both sales and delivery, of the business. The retail part of the business was handled by another employee, and as a result, petitioner had very little personal contact with the retail customers. Petitioner's compensation originally was to be at the rate of $500 per month. However, this was later reduced to $400 per month. In addition, the petitioner as head of a department was paid a bonus based upon the contribution his department made to the success of the business. It was estimated that petitioner's salary and bonus averaged about $9,000 a year. About two *297 to three years after the merger, differences arose between Harter and the petitioner regarding the latter's authority. As a result of these differences, Harter suggested that it would be better if they discontinued doing business together. Thereafter, numerous discussions were held regarding the purchase by Harter of petitioner's interest in the firm, or vice versa. These discussions continued off and on until sometime in 1953. In September of that year Harter offered to buy petitioner's stock or to sell his own stock for $300 a share, in cash. Petitioner followed through and offered to pay Harter $300 per share for his stock. Harter deferred acceptance of the proposal until he could discuss the proposition with his associates. Petitioner's offer was subsequently rejected by Harter in early September 1953. In mid-September 1953 petitioner and Harter reached an agreement whereby petitioner agreed to sell his stock to the corporation. On or about October 1, 1953, petitioner executed a sales agreement under which he was to receive the sum of $63,000 for his 210 shares of Belle Isle stock. The consideration of $63,000 was to be paid as follows: $9,000 on October 1, 1953; $9,000 on January 2, 1954; *298 and $4,500 on the second day of each January thereafter until fully paid. In addition to the sales agreement, petitioner executed a separate agreement, also on October 1, 1953, providing, inter alia, that in consideration for the payment of $45,000, payable $2,250 quarterly on the second day of October, January, April and July of each year for a period of five years petitioner agreed not to compete with Belle Isle in any manner and in any area in which Belle Isle might be conducting its business, for a period of five years from the date of the agreement. The covenant not to compete was witnessed by J. A. MacGregor, the petitioner's certified public accountant, who was present at the settlement. The net worth of Belle Isle as of September 30, 1953, was $165,850.97. This figure was computed without reference to any goodwill which Belle Isle may have developed by its own independent operation [1] and without regard to the appreciated value of the real estate owned by Belle Isle. We find, as a fact, that the real estate owned by Belle Isle had increased in value and as of September 30, 1953, was worth not more than $15,000. We also find as a fact that Belle Isle enjoyed goodwill in the *299 Akron community and that the value of this unrecorded goodwill as of September 30, 1953, was not in excess of $124,388. The book value of Belle Isle stock as of September 30, 1953, was approximately $191 per share. At the time the petitioner sold his 210 shares of Belle Isle stock there were 869 shares of Belle Isle stock outstanding. The stock itself was not traded on the open market nor did it have an established market price. Both before and after petitioner sold his Belle Isle stock small amounts of the stock had been sold to employees of the company and to relatives of Harter for approximately $300 per share. In January 1954 petitioner entered into the small loan and discount businesses and at the hearing of this case was still engaged in those businesses. The agreement of sale and the agreement not to compete accurately reflected the transaction as understood by the parties and both agreements were reached *300 as a result of arm's length bargaining. Opinion Petitioner's principal argument is that the total consideration received by him, including that paid purportedly for his agreement not to compete, represented the fair value of his stock and, consequently, the amount allocated to the agreement not to compete was unrealistic and allocated only as part of a scheme to gain a tax advantage for the purchaser. In the alternative, petitioner contends that the agreement not to compete, if bona fide, was nonseverable from the purchase of the stock and, therefore, served merely to insure the purchaser the beneficial enjoyment of goodwill. In support of his principal argument, petitioner stated that he agreed to sell his stock for $500 a share [2] and that he had arrived at this figure by considering the book value of the stock together with his estimate of Belle Isle's unrecorded goodwill and real estate appreciation. Petitioner also testified that nothing was said to him regarding the execution of an agreement not to compete prior to the date on which the sales agreement was actually executed. Petitioner added that ae was not familiar with the tax consequences of such an agreement and agreed *301 to sign the agreement only because of his poor health and the fact that he was no longer interested in the dairy business. While this Court is not bound by the parol evidence rule in seeking to determine the tax consequences of a transaction to which the Government is not a party, , nevertheless, when the parties to a transaction such as this one have specifically set out a covenant not to compete in a separate agreement and have given it an assigned value, strong proof must be adduced by the party seeking to overcome that declaration. (C.A. 2, 1959); , affd. (C.A. 9, 1961). The petitioner's testimony regarding the sales price of the stock, as well as the circumstances surrounding the agreement not to compete, was in conflict with Harter's testimony on the same subjects. Harter testified unequivocally that *302 the price finally agreed upon was $300 per share, that the agreement not to compete had been discussed during prior negotiations, and that at several of the conferences between him and petitioner regarding the sale of the latter's stock petitioner was accompanied by legal counsel as well as by his accountant. Furthermore, Harter stated that Belle Isle felt it was essential that an agreement not to compete be obtained from petitioner. He explained that this feeling was motivated to a large degree by such things as petitioner's long association with the dairy business, the fact that the bulk of Belle Isle's wholesale business was derived from former customers of X-Cel Dairy, petitioner's personal relationship with many of these customers and the fact that petitioner had on previous occasions sold out his dairy business and later had re-entered the same business. After viewing the record as a whole, we have not been persuaded by petitioner that Belle Isle originally agreed to pay $500 per share for his stock or that his stock was actually worth $500 per share. We have previously found as a fact that the petitioner owned a minority interest in the corporation, that the stock was not *303 traded on the open market and that the book value as of September 30, 1953, was approximately $191 per share. The petitioner admitted that the book value of the stock was the main factor considered in determining the price per share. Under such circumstances, we find it difficult to believe that Belle Isle would have agreed to pay petitioner $500 per share for his minority interest. Furtheremore, even if we were to redetermine the book value of the stock based upon the appreciated value of the real estate and the unrecorded goodwill, thereby providing a book value of approximately $343 per share, we are still unable to conclude, in the absence of other evidence further enhancing the value of the stock, that the petitioner's stock was actually worth $500 per share. Our belief in this regard is consistent with the fact that several sales of small amounts of Belle Isle stock occurred both a short time before and after the instant transaction. The price paid for the stock on each of these occasions was approximately $300 per share. The petitioner's specific assertion that the amount allocated to the agreement not to compete was unrealistic and allocated only to provide a tax advantage *304 to the purchaser is also not supported by the record. The testimony of Harter convinces us that Belle Isle had sound business reasons apart from any tax consideration for wanting an agreement not to compete from petitioner and treated this agreement as a separate item in its negotiations with petitioner. In addition, the direct relation between the petitioner's prior annual salary and the amounts he was to receive yearly under the agreement not to compete attests to the validity of the amount allocated to this agreement. The fact that the petitioner may have given inadequate consideration to what the tax consequences to him of an agreement not to compete might be, and that had he been more fully aware of such consequences more vigorous bargaining on the allocation might have resulted, are "iffy" questions and do not control the issue here. , affd. (C.A. 10, 1954). Petitioner's alternative position is that the agreement not to compete was nonseverable from the purchase of the stock and, therefore, served merely to insure the purchaser the beneficial enjoyment of goodwill. It is true that this *305 Court has held that where a covenant not to compete accompanies the transfer of goodwill in the sale of a going concern and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the goodwill which has been acquired the covenant is regarded as nonseverable and as being, in effect, a contributing element of the assets transferred. ; ; . Nevertheless, we have also noted that a distinction exists between the sale of a business by its direct owner on the one hand, where goodwill is the property of the vendor and his covenant may well be a contributing factor in the sale of the entire business, and, on the other hand, situations where the covenant is the personal agreement of the individuals who, as such, have no direct proprietary rights in the goodwill, including also transfers of stock accompanied by personal covenants of the stockholders. , affd. (C.A. 2, 1959). The instant case falls *306 into the latter category. The petitioner, here, agreed to sell his stock in Belle Isle. The goodwill of Belle Isle which was the only transferable goodwill ( , was not covered as a separate item in the contract of sale. However, as a separate item in the transaction, petitioner agreed for a specified consideration to sell his covenant not to compete. Under such circumstances, we believe the agreement not to compete is severable from the purchase of the stock. See and cf. (C.A. 10, 1954); Upon all the authorities, and after careful consideration of the record, we conclude that the agreement of sale and the agreement not to compete reflected the transaction as understood by the parties; that both agreements were reached as a result of arm's length bargaining; and that the agreement not to compete correctly incorporates the consideration paid for it, which should hence be treated as ordinary income to the petitioner. Decision will be entered for the respondent. Footnotes
1. Goodwill in the amount of $6,876 was shown in the Belle Isle balance sheet dated September 30, 1953. However, this figure merely represented goodwill acquired through the purchase of other small dairies and did not represent goodwill developed by Belle Isle itself.↩
2. At $500 a share, petitioner would have received $105,000. Under the two contracts actually executed by petitioner, the total consideration petitioner received was $108,000.↩